UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **United States of America** | ) | |
| | ) | Case no. 4:24-CR-00550 |
| | ) | |
| v. | ) | **Motion to Suppress** |
| | ) | |
| **Donald Wayne Shelly** | ) | |

## Motion to Suppress

Donald Shelly, through Counsel and pursuant to the Fourth Amendment to the United States Constitution, moves this Honorable Court to suppress all evidence obtained as a result of the warrantless search and seizure of his cell phone conducted on and after October 2, 2025. *See Riley v. California*, 573 U.S. 373, 403 (2014) (holding that police must obtain a warrant before searching a cell phone).

The police justified the search on the ground that Mr. Shelly knowingly and voluntarily consented to it. He did not. Mr. Shelly agreed to allow the police to conduct a cursory review of the contents of his phone at his home and in his presence. After the police had Mr. Shelly sign a consent to search form purporting to allow Mr. Shelly to "rescind" his consent at any time, the police told Mr. Shelly that they were taking the phone and extracting its contents, whether he liked it or not. As a result, his consent was "no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968). The Constitution requires more.

1

**Factual Background**

On October 2, 2024, F.B.I. Special Agent Brianna Reese and Harris County Detective Elvia Villarreal drove to Donald Shelly's home to investigate allegations concerning the sexual abuse of a minor. The allegation at the center of the investigation was that Ms. Brianna Cornman had recorded herself abusing her daughter and then transmitted the recording to Mr. Shelly. Upon arrival, Agent Reese and Detective Villarreal knocked on Mr. Shelly's door and he answered. Agent Reese and Detective Villarreal introduced themselves, explained they were present to investigate allegations of child abuse, and asked Mr. Shelly if he would speak with them. Mr. Shelly responded, "I'm not going to have this conversation right now . . . ."[1] Agent Reese replied, "Well, it was our opinion that things are pretty serious, so we did actually want to have a conversation with you, especially if there are children being involved. We can't really wait."

Mr. Shelly explained that he had spoken to "CPS" the day before and did not know the whereabouts of the "person"[2] they were looking for. He explained that he wanted "her" (Ms. Cornman) out of his life. Mr. Shelly also explained that he understood that Agent Reese could "compel [him] to do things if [she] chose to." Agent Reese acknowledged that Mr. Shelly wanted "to get this out of the way," but

---

[1] The interview was captured on an audio recording device.
[2] Mr. Shelly was referring to Brianna Cornman.

emphasized that "it's not just going to go away." And as a result, she and Detective Villarreal needed to speak with him.

Agent Reese offered to conduct the interview inside one of her or Detective Villarreal's police cars. Detective Villarreal jumped in to reiterate, "We're ready to allow you to get this over with, but we need to talk to you about it. Like she said, it's not going to go away." After Detective Villarreal explained they needed "maybe five, maybe ten" minutes of his time, Mr. Shelly agreed to have a ten-minute conversation with the two officers. What followed was a ninety-minute interrogation conducted inside Mr. Shelly's home.

At the outset of the interrogation, Detective Villarreal advised Mr. Shelly that they needed to read him "something really quickly" before they continued with the questions. Detective Villarreal described it as "just a formality." Agent Reese added that it was "*Miranda*"—something that she assumed Mr. Shelly had seen "in the movies." Agent Reese then read Mr. Shelly his *Miranda* rights and Mr. Shelly stated that he understood them.

Agent Reese and Detective Villarreal asked Mr. Shelly questions about how he came to know Ms. Cornman and about the nature of their relationship. Mr. Shelly explained that the two met on an escort website several years prior. He stated that although they never had sex, he would send her money periodically when she asked for it. Sometimes, Mr. Shelly explained that Ms. Cornman would send him nude

3

photographs of herself. Overtime, when Mr. Shelly appeared reluctant to continue sending Ms. Cornman money, she began reaching out to Mr. Shelly's family members and threatening to expose information about him.

Mr. Shelly stated that eventually, he asked Ms. Cornman for "things" that would give him "leverage[]" against her, so that she would cease extorting him for money. Specifically, Mr. Shelly stated that he asked Ms. Cornman to "offer up [her] daughter to [him]." Mr. Shelly explained that he had "no desire for that," but was, "like, trying to get anything that [was] of the order of magnitude that [he] could leverage her back with." He added that he was "not proud of that," but felt like it was something he was driven toward in a moment of "desperation."

Agent Villarreal asked Mr. Shelly if he would show them the correspondence he had with Ms. Cornman on his cell phone. She explained she wanted to see "the actual evidence." Mr. Shelly stated that he assumed most of their messages had been deleted. Instead, he offered to call Ms. Cornman, put her on speakerphone, and allow the officers to observe him having a conversation with her in real-time. Mr. Shelly then called Ms. Cornman and told her that he would send her $30 in exchange for her leaving him alone. Ms. Cornman agreed to the proposal and then hung up the phone when Mr. Shelly asked what she would do if Mr. Shelly refused to send her the money.

Following the phone conversation with Ms. Cornman, Agent Reese asked Mr. Shelly if Ms. Cornman had sent "explicit" photographs of her daughter to him. Mr. Shelly replied, "she did but I don't have them in my possession." Mr. Shelly stated that he had previously deleted them. Detective Villarreal then pressed Mr. Shelly on whether he had evidence of the conversation between he and Ms. Cornman concerning the photographs. Mr. Shelly stated that he did not have them.

Agent Reese then stated, "rather than making this a lot more complicated we have a consent to search form if you would allow us just consent to go through" the phone. Agent Reese explained that she and Detective Villarreal "can't walk away [from] here" due to the information Mr. Shelly had disclosed about Ms. Cornman's daughter.

After a back-and-forth about the importance of reviewing Mr. Shelly's phone, Mr. Shelly stated that he would check what he "may or may not have" on the phone. Detective Villarreal then walked to her vehicle to get a consent to search form.

Once Detective Villarreal returned with the form, Agent Reese advised Detective Villarreal that she had just told Mr. Shelly that they could go through the phone "together." Agent Reese then explained that the form Detective Villarreal brought was a "consent to search form," but that, "like I said we could go through your phone, *just with you*." She then instructed Mr. Shelly to fill out the form, writing his name and a description of the phone.

Immediately after asking Mr. Shelly to complete the form, and while he was completing it, Agent Villarreal resumed asking him questions about his relationship with Ms. Cornman.

The form itself belies the assurances that Agent Reese had given Mr. Shelly. The form states that by signing the form, Mr. Shelly was authorizing a search of his phone to be conducted "away from [his] premises and in a controlled environment." But immediately prior to seeking his signature, Agent Reese advised Mr. Shelly that they would be reviewing the phone "together" and "with [him]."

Mr. Shelly then proceeded to show the officers some correspondence between he and Ms. Cornman, including a video of Ms. Cornman stating that she was giving Mr. Shelly "full access" to her daughter and videos of Ms. Cornman admitting to threatening Mr. Shelly by contacting his family unless she received payment from him. Agent Reese and Detective Villarreal then spent the next twenty minutes searching through Mr. Shelly's phone.

An hour into what was originally promised to be a five or ten-minute conversation, Detective Villarreal explained the following:

> So, at this point, because this is where you received the pictures of [minor victim], I have to get this phone downloaded, okay? I can't give it back to you until I'm certain that it doesn't have anything

6

because you said it was on this phone. So, I have to take this phone, get it downloaded, and I can get it back to you as soon as I possibly can.

The following exchange ensued:

**Mr. Shelly:** That creates issues for me.

**Detective Villarreal:** I know. I'm sorry.

**Mr. Shelly:** And I've been cooperative here.

**Detective Villarreal:** I understand that, but I can't let you keep it until I find out if everything is wiped. Like, I can't...You understand what predicament that puts me in?

**Mr. Shelly:** I do understand that. So, is there a way that I can satisfy that request while you're here without you doing that?

**Agent Reese:** So, we need to dump it onto a computer. What we can do is we can do it in-house. So, it would be a pretty quick turnaround. We won't bring it to the lab or anything. So, we can have it back to you.

**Mr. Shelly:** Can you do that here?

**Detective Villarreal:** No, not here in your house.

**Agent Reese:** I can't bring, like, the device here.

**Mr. Shelly:** Is that going to be back to me today?

**Detective Villarreal:** Um, possibly. Possibly.

The three then continue to discuss the timeline of the return of the phone. Confused by the fact that the police were now telling him that they no longer needed his permission to search his phone, Mr. Shelly asked: "Right now, you're not going to hand me my phone back if I ask for it?" Detective Villarreal replied, "No."

Agent Reese and Detective Villarreal explained again that they were going to download the contents of Mr. Shelly's phone, but agreed to allow him to send a text message to his wife explaining that he would not have his phone for a while. Mr. Shelly asked when he would have his phone returned to him. Agent Villarreal stated that she would try and get it back to him "by the end of the day."

The officers then ask Mr. Shelly to remove his facial recognition security from the phone to ease their ability to access and search its' contents. After Mr. Shelly complied, they ordered Mr. Shelly to provide them his Apple Watch. Mr. Shelly objected, but Agent Reese and Detective Villarreal explained that he was required to give up his watch as well. They then retrieved a second "consent" form for the Apple Watch and had Mr. Shelly affix his signature to it.

Following a forensic search of Mr. Shelly's phone, the F.B.I. retrieved child sexual abuse material. Mr. Shelly was subsequently charged with one count of receipt of child pornography, one count of possession of child pornography, and one count of production of child pornography, in violation of federal law.

## Argument

The Fourth Amendment requires the police to obtain a search warrant prior to searching the contents of a person's cell phone. *Riley*, 573 U.S. at 403 ("Our answer to the question of what police must do before searching a cell phone . . . is . . . simple—get a warrant."). They did not do so. Instead, the police attempted to rely on Mr. Shelly's consent. The problem is: for consent to relieve the government of the warrant requirement, it must be "freely and voluntarily given." *Bumper*, 391 U.S. at 548 ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given."). The Supreme Court has made clear that consent given in the face of "a claim of lawful authority" is not consent at all. *Id.* Rather, it is merely "acquiescence" and insufficient to authorize the government to discharge its "burden" of justifying the lawfulness of a search. *Id.*

Here, prior to taking away Mr. Shelly's phone (and Apple Watch) for a forensic search, he was explicitly told that his refusal was meaningless. But it's axiomatic that the power to consent implies the power to refuse. *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973) (holding that *knowledge* of the right to refuse is not a prerequisite to establishing voluntary consent). Because Mr. Shelly was told in no uncertain terms that he could not refuse the search of his phone, his signature on the consent to search form was constitutionally inadequate to justify the ensuing

9

search. And because the police never sought a warrant, the search and seizure violated his rights under the Fourth Amendment.

As a result, all evidence collected as a result of the warrantless search and seizure of Mr. Shelly's phone ought to be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

          Respectfully submitted,

          PHILIP G. GALLAGHER
          Federal Public Defender
          Southern District of Texas No. 566458
          New Jersey State Bar No. 2320341

          By /s/ Ryan Rones
          RYAN RONES
          Assistant Federal Public Defender
          North Carolina State Bar ID No. 53592
          Southern District of Texas No. 3900503
          Attorneys for Defendant
          440 Louisiana, Suite 1350
          Houston, Texas   77002
          Telephone:  713.718.4600

## CERTIFICATE OF SERVICE

I certify that on December 8, 2025, a copy of the foregoing Motion to Suppress was served by Notification of Electronic Filing and was delivered by email to the office of Assistant United States Attorney Luis Batarse.

          By /s/ Ryan Rones
          RYAN RONES